IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN W. FISHBACK,              *
         Plaintiff

    v.                        *     CIVIL ACTION NO. JFM-08-953

GARY  MAYNARD, et al.,        *
                       ***

## MEMORANDUM

Pending are defendants' supplemental motion to dismiss or for summary judgment and plaintiff's self-represented oppositions. ECF Nos. 18, 23, 36, 43, 44, 58, 88, 94.  The case is ripe for dispositive review.[1]  Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2010).

---

[1]      Defendants' original motion to dismiss or for summary judgment and plaintiff's cross-motion for summary judgment were denied without prejudice on August 18, 2009.  The case was stayed at that time pending the proceedings in *Cabana v. Warden, et al.*, Civil Action No. JFM-07-2205 (D. Md.).  ECF No. 46.  On April 6, 2010, the stay was lifted, counsel was ordered to supplement the existing record, and the parties were granted additional time to file supplemental responsive pleadings.  ECF No. 49.

On March 3, 2011, the case was again stayed due to plaintiff's complaints of mail tampering which called in to question his ability to respond to the dispositive motions.  ECF No. 78.  The case was re-opened on May 9, 2012.  ECF No. 83.  Thereafter, plaintiff sought, and was granted, extensions of time to supplement the record.  ECF Nos. 84-87.

Plaintiff's pending motion for appointment of counsel and motion to allow discovery (ECF Nos. 96 and 97) shall be denied. Plaintiff 's complaint is not complex and he has more than adequately presented his case.

Plaintiff has filed motion requesting discovery pursuant to Fed. R. Civ. P. 56.  Plaintiff states that he cannot adequately respond to the pending dispositive motions without access to his medical records, affidavits administrative remedy request, etc.  The court notes that the first dispositive motion filed in this case was filed nearly 5 years ago and provided plaintiff with defendants' arguments and documentation concerning their defenses. The renewed motion was filed over 4 years ago.  Plaintiff has been provided his case management records, affidavits, and polices and procedure regarding creation of the BMP.  ECF Nos. 18 & 38.

Under Local Rule 104.4. (D. Md. 2011), discovery does not begin in a civil action until the court issues a scheduling order or otherwise orders that discovery proceed, unless the parties agree.  No scheduling order has been entered in this matter, and the parties have not agreed to commence discovery.  Moreover, plaintiff has failed to state with any particularity the basis for his request.  He offers no explanation as to how any of the requested documents would aid his effort to counter the pending dispositive motion other than to state in general terms that he cannot properly oppose the summary judgment motions without the requested documents,  nor can he present essential facts.  He has failed to demonstrate that the material requested is essential to his opposition as required under Fed. R. Civ. P. 56(d). Accordingly, plaintiff's request for discovery shall be denied.

## Background

At the time he instituted this case, plaintiff was a Division of Correction ("DOC") inmate alleging that on August 25, 2007, he was removed from general population at the Roxbury Correctional Institution at Hagerstown ("RCI"), transferred to the North Branch Correctional Institution ("NBCI"), and placed on administrative segregation. He claims he was not provided notice or a hearing regarding his transfer to NBCI. Plaintiff indicates that on September 5, 2007, he was placed in NBCI's Special Management Unit ("SMU") and the Quality of Life ("QOL") or "Levels" program without due process. Plaintiff also raised complaints regarding conditions of confinement, confiscated property, access to courts and lack of access to the law library. ECF No. 1. Plaintiff complains that he was not given a written factual basis for his placement on the SMU, but had only been provided vague explanations that it was believed he was a gang member. Added to these initial due process claims is plaintiff's assertion that the conditions of SMU were "atypical" as his assignment was tantamount to indefinite placement on solitary confinement and included the confiscation of property and the revocation of privileges, with the exception of one-hour of "fresh air" per week while in full restraints and twice weekly showers[2] Plaintiff also complains that he was subjected to a Behavioral Management Program ("BMP") while on SMU which allows for inmates to achieve one of six "levels," subject to the decisions of SMU officers and the levels committee. He claims that after the filing his initial complaint he was maintained on the

---

[2]      The conditions under which plaintiff was confined in the SMU included 24-hour cell restriction with only one hour for recreation each week, during which plaintiff was offered an opportunity to go to an outdoor recreation cage restrained with leg irons, handcuffs, a security box, and a waist chain. ECF No. 1.

intake level due to his refusal to voluntarily participate in the program, despite having received no infractions.[3] ECF No. 1.

Plaintiff further raises Fourteenth and Eighth Amendment equal protection and deliberate indifference claims, stating that he was treated differently than other inmates classified to administrative segregation and that the conditions of his SMU cell assignment subjected him to cruel and unusual punishment.[4] In addition, he claims his forced participation in the BMP violated his First Amendment rights. ECF No. 1. He seeks declaratory and injunctive relief, along with punitive and compensatory damages. *Id.*

In response, defendants assert that plaintiff was transferred based upon a report that he was a validated member of Dead Man Incorporated ("DMI"), a security threat group, and has an extensive poor adjustment violence. ECF No. 18, Ex. 1. Case management Manager Casey M. Campbell avers that plaintiff has an extensive history of violence including violence against correctional officers, including spitting in an officer's face and breaking the hand of a correctional officer. *Id*

On August 23, 2007, plaintiff was transferred from RCI to NBCI. He was assigned to administrative segregation on August 29, 2007, based on the belief that he posed a danger to the security of the institution and/or inmates and/or staff. *Id.*, p. 39-40. Regional Commissioner Jon Galley directed that all inmates received in Housing Unit 6 (the Special Management Unit "SMU")

---

[3] Plaintiff further alleges that the directives were adopted in violation of the Maryland Administrative Procedure Act ("APA"), which requires that regulations subject to amendment or modification must be subject to public notice and comment requirements. ECF No. 1.

[4] Plaintiff claims the one-hour weekly outdoor recreation in a "cage" with full restraints (leg irons, handcuffs, security box, and waist chain) allowed him limited mobility and posed a risk of harm. Plaintiff alleges that the limited amount of time out of his cell for recreation and showers put him at risk of physical and psychological deterioration. *Id.*

at NBCI,[5] be placed on administrative segregation. *Id.*, p. 40. On September 13, 2007, plaintiff was identified as a candidate for housing in NBCI's SMU and placement on the QOL program based on his identification as a member of a security threat group and his lengthy adjustment history. *Id.*, p. 36.

Defendants acknowledge that the QOL program, initially implemented in January 2007, underwent many changes after several gang-related incidents of violence in DOC facilities and it was "difficult to discuss the behaviors that resulted in… placement in the program as many of the individuals were influential in security threat activity." *Id.*, Ex. 2 at p. 5. In addition, defendants concede that the initial process for placement in the program was not clear, resulting in a number of individuals being placed at NBCI with little or no documentation to support the allegation that they were a threat to the security of the institution. Prior to being transferred to the SMU, a form for each inmate was supposed to be filled out by the sending institution and approved by the regional assistant commissioner and the assistant commissioner for programming. This approval process was not done for approximately 90 inmates who were transferred to the SMU at NBCI as "emergency" transfers. Once these inmates were housed at NBCI, they received a case-by-case review by NBCI staff. A "re-review" of all of the inmates was not completed until October of 2007. This resulted in 42 participants being discharged from the program because there was little, if any, documentation supporting their continued placement in the program. *Id.*

Inmates like plaintiff who opted not to participate in the BMP were forced to remain at the initial intake level indefinitely and could not advance unless they decided to participate in the BMP.

---

[5] At the time of plaintiff's transfer, NBCI had not officially opened and was referred to as part of WCI—Housing Units 6 & 7.

ECF No. 18, Ex. 2. Defendants admit that participation in the program was mandatory until April 2008, when the mandatory status was rescinded by the Assistant Commissioner of Correction. At that time if inmates in the SMU did not participate in the BMP, they were assigned to administrative segregation. The inmates were told they would remain in administrative segregation status until each convinced the Assistant Commissioner that he was no longer a threat to the security of the institution. They were further informed that the only manner upon which they could be removed would be to complete the BMP so as to establish they were not a threat. While on administrative segregation, inmates were reviewed by case management personnel at least once every 30 days and case managers were to consider available alternatives to continued administrative segregation including additional programming opportunities. ECF No. 18, Exs. 1, 2 & 5; ECF No. 58.

On August 27, 2007, plaintiff was placed on administrative segregation after he was deemed dangerous to institutional safety.[6] *Id.*, Ex. 1. Plaintiff's adjustment history includes assaultive conduct, violence against staff, possession of controlled dangerous substances, and he has been found guilty of 11 category one rule infractions since 2001. *Id.* and ECF No. 58, Ex. 5. NBCI Intelligence Lieutenant Damon Thomas indicates that plaintiff has been verified as a gang member. *Id.*

On August 23, 2007, prior to plaintiff's transfer from RCI, a case management review for reassignment purposes was held. ECF No. 36, Ex. 1, p. 44. Plaintiff did not attend the review and at that time he was reassigned to administrative segregation and then transferred to NBCI . *Id.* On August 30, 2007, NBCI Case Management recommended plaintiff be reassigned from administrative

---

[6] Defendants indicate plaintiff was pending adjustment at this time. Plaintiff disputes that he had any disciplinary tickets pending at the time of this designation. ECF Nos. 23 & 44. This factual dispute is not material to the outcome of this case.

segregation 120 (the 5 day period, excluding weekends where an inmate can be held on administrative segregation without a review) to administrative segregation. During this review plaintiff was provided the opportunity to discuss and challenge the appropriateness of his assignment to administrative segregation. *Id*. The Warden's designee approved the recommendation on September 5, 2007. ECF No. 18*,* Ex. 1, p. 38.

Plaintiff came to the attention of the QOL committee on September 13, 2007, due to their focus on gang activity throughout the prison system and plaintiff's identification as a gang member with a long history of violent conduct. He was admitted to the QOL Levels program. *Id*., p. 36. He then underwent his first QOL evaluation and discussion of his BMP and he refused to participate in the program or sign the BMP. *Id*., Ex. 2. Defendants indicate that at every case management review plaintiff was advised of the rationale for his transfer and placement in the SMU. ECF No. 36, Ex. 3. The parties do not dispute that plaintiff was not provided access to his intelligence file.[7]

In November of 2007, plaintiff progressed to level one of the program, however he was returned to the intake level after a December 10, 2007 cell extraction for shouting out gang statements form his cell. Between December 2007 and April 2008, plaintiff progressed from the intake level to level two of the program. *Id*., p. 12-18.

In April, 2008 the program was made voluntary. Those opting not to participate were removed from the program and placed on administrative segregation. On April 9, 2008, plaintiff signed out of the program and was reassigned to administrative segregation at his April 24, 2008 case management review. *Id*., Ex. 1, p. 16-20. On June 14, 2008, plaintiff was assigned to

---

[7] While plaintiff disputes his gang affiliation , there is no indication that he contacted the intelligence officer at any of the institutions where he was housed in an effort to formally renounce any gang affiliation or clarify his gang affiliation as is permitted under DOC policy.

disciplinary segregation for fighting with another inmate in the segregation cage during recreation. *Id.*, Ex. 1, p. 50-57. Due to that offense and other subsequent offenses he was scheduled to remain on disciplinary segregation until the fall of 2010.[8] ECF No. 36, Ex. 1.

Plaintiff was returned to administrative segregation on August 16, 2010, after completion of his disciplinary segregation term. Segregation review allows a placement team comprised of correctional staff to determine suitability for placement in general population. During plaintiff's segregation review, staff noted plaintiff had an enemy housed at NBCI on disciplinary segregation. ECF No. 69, Exs 1 & 2. During 2011, he was housed in general population at NBCI and then transferred to Western Correctional Institution (WCI).[9] ECF No. 94.

In his opposition, plaintiff focuses primarily on his claim that confinement on the SMU at NBCI constitutes an atypical and significant hardship giving rise to a liberty interest. ECF No. 23. He states that he should have been accorded a due process hearing and notification of the factual basis for the charges against him. Plaintiff complains that his stay in SMU was for an "indefinite" period of time, limited only by defendants' discretion and completion of the BMP.[10] He maintains that the SMU confinement constitutes a typical and significant hardship under the cases of *Wilkerson v. Austin*, 545 U.S. 209 (2005) and *Farmer v. Kavanaugh*, 494 F.Supp.2d 345 (D. Md. 2007), due to the indefinite duration, extreme isolation and restrictions on the SMU, and his inability to earn

---

[8]      In August of 2009 half a razor blade, 3 pieces of flat steel, approximately 7 inches long with a rounded tip, and a modified paperclip that could be used as a handcuff key were found in plaintiff's cell. ECF No. 58, Ex. 5. p. 11-14.

[9]      Any claim that this transfer to WCI was improper is not properly before the court. Plaintiff is free to file a new civil rights complaint regarding that transfer if he believes his civil rights were violated.

[10]      Plaintiff asserted that as he remained housed on administrative segregation at NBCI until such time as he could demonstrate to administrators he was no longer a threat, the duration of his confinement was limited only by the discretion of the Commissioner and he could have been held on administrative segregation for the remainder of his sentence. ECF Nos 23 & 44.

diminution credits to shorten the length of his sentence. ECF Nos. 23 & 44. He claims that he is entitled to process that provides him fair notice of the factual reasons for his assignment and opportunity to respond. *Id*. He notes the difference in his confinement in general population at RCI and is confinement on the SMU at NBCI. *Id*. Plaintiff argues that defendants have failed to come forward with evidence justifying his placement on SMU and asserts that even though he remained assigned to administrative segregation after April of 2008, his case management reviews were cursory at best. *Id*.

## Standard of Review

A.      Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 562. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the complaint in light of a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the

facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. Thus, a complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id.* 570.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

B.    Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Analysis

## Due Process Claims

### Administrative Segregation Assignment

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Following the reasoning of the Supreme Court in *Sandin*, the court finds no liberty violation implicated in the decisions associated with Plaintiff's initial placement on administrative segregation at NBCI, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Plaintiff was transferred from RCI to NBCI and remained on segregation. Nothing in the record shows that the nature of plaintiff's

assignments to administrative segregation at NBCI comprised the atypical hardships contemplated by *Sandin* or *Beverati*. Therefore, the assignments do not implicate a liberty interest. Further, plaintiff's transfer to NBCI does not in and of itself implicate a liberty interest; he has no entitlement to notice and an opportunity to be heard prior to his transfer because as a prisoner he has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976).

SMU Assignment

The restrictions which are the subject of plaintiff's complaint were imposed in August of 2007, when plaintiff was assigned to the SMU at NBCI. This court must determine if the conditions under which he was confined while in the SMU constituted an atypical and significant hardship.

There is no argument that the conditions at NBCI SMU at the intake level are extremely restrictive, controlled, monitored, and isolated. Intake level inmates are housed alone, have no visits aside from attorneys or clergy, receive limited property privileges, and receive no commissary. The only time an intake level inmate may come out of his cell is to take a shower or to recreate once or twice a week. The physical contact between inmates and between inmates and officers is severely limited.

The Supreme Court examined the due process issue involving inmates confined at the Ohio State Penitentiary ("OSP"), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden, to determine whether a liberty interest was created by isolated confinement and if so, what due process was to be afforded to the inmate so confined. *See Wilkinson v. Austin*, 545 U.S. 209 (2005). At the OSP, exercise was limited to one hour a day in a small indoor room and the inmates were exposed to light 24 hours per day.

*Wilkinson* recognized that the deprivations detailed in that case exist in most solitary confinement facilities and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it.[11] *Id.*, at 224. These factors included (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id.* The Supreme Court found that "while any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," triggering a protected liberty interest in avoiding placement on such confinement. *Id.* In reviewing *Wilkinson*, it would appear that the court instructed lower courts to consider the totality of circumstances in a given facility. *Id.*

Applying the Supreme Court's rationale in *Wilkinson*, this court found that a transfer to the Maryland Correctional Adjustment Center ("MCAC"), a super-maximum security facility, implicated procedural due process protections, and concluded that:

> In light of the prohibition of "almost all human contact," coupled with severe restrictions on movement or any type of activity, both of which may last for the duration of some inmates' underlying sentences, and may be less likely to be relieved by parole than the less arduous conditions at other facilities, the conditions at MCAC create such a hardship when judged against "any plausible baseline." Inmates thus have a protected liberty interest in avoiding transfer to MCAC.

*Farmer v. Kavanaugh*, 494 F. Supp. 2d 345, 358 (D. Md. 2007).

Plaintiff describes the conditions imposed in the SMU as follows. All property was confiscated and privileges were revoked, with the exception of one weekly hour of fresh air exercise,

---

[11] While *Wilkinson* involved transfer to and housing in the isolated confinement of a "supermax" facility, it involved similar solitary confinement issues found here-- isolated human contact for potentially "indefinite" periods. Therefore, the court finds *Wilkinson* instructive for due process analysis purposes.

in full restraints.    Two weekly showers were to be provided but could be revoked for minor

offenses, such as talking to other inmates, writing "kites" to other inmates, or covering cell lighting,

which is on constantly.    ECF Nos. 1, 23 & 44**.** These restrictive conditions at the intake level,

together with the initial mandatory nature of the program, approach the type of conditions this court

has found to invoke a protected liberty interest.

   At the time plaintiff was assigned to the SMU, inmates were informed that they must

participate in the BMP in order to earn their way out of the SMU and if they opted out of BMP, they

would remain at the most restrictive intake level until they agreed to participate.   Plaintiff states that

confinement in the SMU was of an indefinite duration because of  the mandatory nature of program

participation.[12]   When the "mandatory" requirement was removed, inmates who chose not to

participate in the BMP were assigned to administrative segregation and told they would remain so

assigned until the Assistant Commissioner was convinced they were no longer a threat to the

security of the institution.   Inmates were told however, that the only way they could convince the

Assistant Commissioner was to participate in the BMP.   Even when participation in the BMP was

deemed "voluntary," it was clear that participation was required if an inmate had any desire to return

to general population.   Thus, the assignment to administrative segregation for non-participants was

indefinite.

---

[12]        The difference between this case and *Farmer* is that the length of plaintiff's stay on various
SMU levels was in his own hands. The ability to move forward and to earn more privileges is based on the
behavior of the inmate participants and does not rely solely on the discretion of a single decision-maker.  In
addition, the SMU policy requires regular reviews of the inmate participant's status.  The record evidence
shows that reviews were conducted in plaintiff's case, albeit such review was cursory due to his refusal to
participate in the BMP.

Plaintiff baldly claims his housing on SMU and his designation as a member of a prison gang will adversely effect his eligibility for parole. Any such claim lacks evidentiary support. First, unlike the *Wilkinson* inmates, plaintiff's assignment to the SMU did not render him ineligible for parole for the duration of his stay. Second, plaintiff's violent offense and dismal adjustment history are factors weighing against his suitability for parole. Thus, the undersigned does not find any assertion regarding parole eligibility persuasive; however, the indefinite duration of the restrictive conditions does give rise to a liberty interest entitling plaintiff to due process protection arising at the time of assignment to the SMU.

The *Wilkinson* Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates received written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and were provided a prepared form explaining why the review was initiated. *Wilkinson*, 545 U.S. at 216. The Ohio inmates were permitted to attend the hearing where they were allowed to offer "pertinent information, explanation and/or objections to OSP placement and may submit a written statement," but could not call witnesses. *Id*. In addition to the notice and hearing, the Ohio system included a review of the committee's decision by the warden, who was to provide reasons for an approval of an assignment, as well as an additional review by a bureau which was vested with final decision-making authority over all inmate assignments in Ohio. *Id*. After these reviews were completed, the inmate was allowed 15 days to file objections with the bureau and only after this 15-day period expired was the inmate transferred to the facility. *Id*. at 217. Inmates who were transferred were

given another review within 30 days of their arrival and, thereafter, were reviewed yearly. *Id.*

The three factors to be balanced to determine how much process is due are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-225, citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendants were directed to file under seal all documentation concerning any investigation into plaintiff's alleged threatening activity. Plaintiff has been provided information indicating that defendants possess documents validating plaintiff as a member of Dead Man Inc. (DMI). Plaintiff has not been provided with the specific information contained in his intelligence file as it would create a further risk to institutional security. ECF No. 58. Plaintiff has, however, generally been advised that the DOC believes he is a member of DMI and it is irrefutable that he has a lengthy and poor adjustment history. While plaintiff claims that he was never placed on notice nor given an opportunity to refute the allegations regarding his threat to institutional security, his protest is belied by the record.

As a prisoner, plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. Plaintiff is not entitled to an adversarial hearing, witnesses, evidence introduction, or other trappings of a full trial.

16

Plaintiff acknowledges that he was told he was being assigned to administrative segregation because he was believed to be a threat to the security of the institution. The exigencies present explain why notice was not provided before plaintiff was assigned to administrative segregation. Expertise of prison officials in matters of security must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). Defendants admit that a large number of the 90 inmates initially assigned to the SMU were assigned erroneously, but those inmates were processed out of the program when it was discovered there was no supporting documentation warranting their assignment. *See* ECF No. 18. Plaintiff, however, was not entitled to reassignment based on documentation of his involvement in activities threatening to the security of the institution including membership in a STG and his lengthy adjustment history. *See* ECF No. 18, 36 & 58. Thus, there were safeguards in place to correct erroneous deprivations.

While the process given to inmates at NBCI did not provide for as many levels of administrative review as given to the inmates in *Wilkinson*, the reviews occurred monthly rather than annually. The undersigned finds that the process afforded to plaintiff met with minimal constitutional standards.

Directives

To the extent plaintiff alleges that defendants failed to comply with their own written policies and directives, his claim fails. The adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due

process.  *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[13]

### Property Claim

Plaintiff's allegations that his property was improperly confiscated upon his transfer also provides no relief.  In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U. S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.[14]  *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[15]  Even if plaintiff's property were improperly destroyed, such a claim does not rise to a constitutional violation.

### Retaliation

Plaintiff alleges that his transfer occurred in retaliation for filing other civil rights cases against correctional employees.  ECF No. 1. As noted above, plaintiff was transferred upon opening of the SMU at NBCI and the identification of inmates who were gang members or otherwise were threats to security.  "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'"  *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D.

---

[13]     Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

[14]     Plaintiff may avail himself of remedies under the Maryland's Tort Claims Act and through the Inmate Grievance Office.

[15]     Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing plaintiff's due process claim.

N.C. 1996) (conclusory allegations of retaliation insufficient to state claim). "In the prison context, we treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris,* 73 F.3de 1310, 1317 (4th Cir. 1996).

### Equal Protection Claims

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful. *See Williams v. Bitner*, 307 Fed. Appx. 609, 611 (3rd Cir. 2009). If the discrimination was based on plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, plaintiff must show that the discrimination did not bear a rationale relationship to a legitimate government purpose. *See Cleburne*, 473 U.S. at 440-42.

Viewing the facts and papers in a light most favorable to plaintiff, he presents no genuine dispute whether the denial of his privileges violated equal protection. *See Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Plaintiff has presented no evidence that his SMU and administrative segregation placements were based on a suspect classification. Rather, the evidence shows that he was so assigned because his membership in a prison gang and lengthy adjustment history made him a security threat. ECF Nos. 18 & 36. The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior." ECF No. 18, Ex. 3. This is a legitimate government purpose. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("internal [prison] security

[is] perhaps the most legitimate of penological goals"). Curtailment of visitation, recreation, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," is rationally related to providing a safer prison environment. *Id.*; s*ee Overton*, 539 U.S. at 133. Defendants are entitled to summary judgment on plaintiff's equal protection claim.

## Eighth Amendment Claim

To the extent plaintiff alleges he was subjected to cruel and unusual punishment as a result of his confinement in the SMU, his claim fails. Routine discomfort is part of prison life. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996), *citing Hudson v. McMillan*, 503 U.S. 1, 8-9 (1992). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). Notwithstanding the isolation plaintiff suffered in the SMU and his allegations that he had limited fresh air activities causing him to require an increase in his anti-depression medication (ECF Nos. 1, 23, 44 & 88), there is no evidence that he suffered serious or significant physical or emotional injury as a result of his confinement.[16] Defendants are therefore entitled to summary judgment on any Eighth Amendment claim.

## First Amendment

Plaintiff claims that the BMP seeks to change the way he thinks and what he believes

---

[16]     Plaintiff also indicates that while on the SMU he had limited access to the law library and could "only order cases from Baltimore via satellite service but only if I know the exact citation."  ECF Nos. 1, 23, 44 & 88.  Whether offered as a ground under the Fourteenth Amendment as a due process or access-to-courts claim, plaintiff has failed to allege a constitutional violation based upon this limited allegation.

through psychological approaches and punishment.  ECF Nos. 1, 23, 44 & 88.  He alleges that he made officials aware that he did not wish to participate in the BMP and as a result of his choice he remained in solitary confinement indefinitely.

The First Amendment protects "the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  An inmate, however, does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S 817, 822 (1974).  Thus, to show a violation of his First Amendment rights, an inmate must demonstrate that the restriction "serve[d] no legitimate penological goal and/or was not reasonably related to rehabilitation."  *Folk v. Attorney General*, 425 F. Supp.2d 663, 673 (W. D. Pa. 2006).

The BMP was intended to "reduce risky behavior" of inmates "deemed to be a security threat to the good order of [the institution]," and to facilitate their "ultimate[]…return to a less restrictive environment."  ECF No. 18, Ex. 3 at p. 4.  Inmates were required to "give a verbal commitment to participate in the program" and to "demonstrate [r]espectful, appropriate behavior" to progress through the BMP levels.  *Id.*, Ex. 3 at p. 7.  Plaintiff was placed in the BMP because he was deemed to be a threat to institutional security and it was believed that he would benefit from participating in the program.   ECF Nos. 18 & 58.

Plaintiff raises no genuine issue about the program's penological goal of "reducing risky behavior" and improving institutional safety or its reasonable relationship to his rehabilitation.  *See Folk*, 425 F.Supp.2d at 673-74 (dismissing inmate's First Amendment claim arising from required

21

participation in rehabilitative programs). Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

## Conclusion

In light of the above analysis, defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, (ECF Nos. 18 & 58) shall be granted as to all claims. Plaintiff's cross motion for summary judgment (ECF No. 23) shall be denied. Plaintiff's motion to appoint counsel and motion for discovery (ECF Nos. 96 & 97) shall be denied. A separate Order follows.

Date:   November 15, 2013                         _____/s/_____

                                                  J. Frederick Motz
                                                  United States District Judge